UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DASH REGULATORY TECHNOLOGIES, LLC,

                    Plaintiff,                   21-cv-8751 (JGK)

                                                 MEMORANDUM OPINION
          – against –                            AND ORDER

AXIOM SOFTWARE LABORATORIES INC,

                    Defendant.

JOHN G. KOELTL, District Judge:

The plaintiff, DASH Regulatory Technologies, LLC ("Dash"),
brings this action against the defendant, Axiom Software
Laboratories Inc. ("Axiom"), for alleged misappropriation of
trade secrets in violation of the Defend Trade Secrets Act
("DTSA"), 18 U.S.C. § 1836 et seq., and in violation of New York
state law.

The defendant now moves to dismiss the plaintiff's second
amended complaint pursuant to Federal Rules of Civil Procedure
12(b)(6) and 12(b)(7) for failure to state a claim and failure
to join an indispensable party. For the following reasons, the
defendant's motion to dismiss is **denied.**

## I.

The following facts are taken from the plaintiff's Second
Amended Complaint ("Complaint"), ECF No. 21, unless otherwise
noted. The plaintiff, Dash, is a "leader in regulatory capital
compliance that provides comprehensive software solutions for

the United States broker-dealer industry." Compl. ¶ 1. The
defendant, Axiom, is a "global company that provides regulatory
services, including risk analytics, data-management, and
regulatory-reporting solutions." Id. ¶ 2. Dash formerly employed
Thomas Martin, who began at Dash on October 24, 2017 as a
Business Development Manager. Id. ¶ 7. Martin was bound to an
Employment Agreement that contained "provisions directed to
employee duties, confidential information (including trade
secrets, and restrictive covenants . . . [and] a noncompetition
clause restricting [Martin] from competing with Dash for a
'Restricted Period' of 90 days immediately following
separation." Id.

As a Business Development Manager, Martin was responsible
for "sales, account management, and business development." Id. ¶
8. On March 15, 2019, Martin "became the sole person at Dash
responsible for sales and business development." Id. ¶ 8.
Because of this, Dash "entrusted [Martin] with a high level of
responsibility."

When Martin joined Dash, he gained access to Dash's
confidential information, "including trade secrets," on his
personal laptop, personal cellphone, and Dash desktop computer.
Id. ¶ 9. Dash alleges that the trade secret information that
Martin had access to "included client proposals, contact
information of key decision makers for Dash clients and

prospective clients, pricing information including yearly
revenue and ramp ups, discounts, client lists including contract
status and expiration dates associated with each client . . . ,
sales strategies based on detailed knowledge of client needs,
contract terms, quality control information, and specific client
preferences regarding what features and products each client
requires." Id. ¶ 10. The trade secrets took the form of "Word
documents, Excel spreadsheets, databases, proposal materials,
notes, and emails." Id. ¶ 11. Dash alleges that this "detailed
information about each client," which it has spent "significant
time and resources gathering and developing," is "central to the
successful operation of Dash's business" because "knowledge of
whom to contact, when to contact them, and what solutions or
offerings to propose are crucial details for developing and
maintaining business." Id. ¶ 10.

Dash alleges several measures that it has taken to ensure
that its trade secrets remain secret. To access the trade
secrets on a device, "a user must log into the device with
specific credentials and a password," and Dash "closely
monitors" which employees have access to trade secrets and the
"specific categories" of trade secrets to which these employees
have access. Id. ¶ 12. Upon an employee's termination of
employment with Dash, Dash "takes careful steps to ensure" that
all trade secrets are removed from the employee's personal

devices before they leave. Id. Moreover, "[a]ll Dash employees" are bound to each of "a Bring Your Own Device Policy, a Code of Conduct, and an Employee Policies and Procedures Handbook," in an effort to ensure that Dash's trade secrets remain safe, secure, and confidential. Id. ¶ 13.

Dash alleges, upon information and belief, that Martin began to consider leaving Dash to join Axiom "sometime in early 2019, if not sooner." Id. ¶ 14. Dash alleges that, on January 3, 2019, Martin began to take Dash's trade secrets "for his own purposes and Axiom's benefit." Id. First, Dash alleges that, on January 3, 2019, Martin "sent himself, to his personal Gmail account, a list of eleven Dash customer contracts that had been verbally agreed to but had not yet been executed by the customers," and included in the email "revenue dollars by [the] customer and the percent increase from the prior year." Id. Second, on March 25, 2019, Martin allegedly emailed himself "financial information regarding two executed contracts, totaling $330,000, and information regarding a contract returned with redlines for an amount of $75,000 with the potential of growing to $180,000 by 2021." Id. Third, on May 9, 2019, Martin emailed himself "a screenshot of a spreadsheet showing the status of 28 customer contracts and sensitive Dash pricing information . . . includ[ing] client names, revenue, and [the] status of the contract identifying whether it was cancelled, out

4

for signature, due for follow-up, or an executed contract." Id. Dash alleges that this information from 2019 was "particularly relevant" because the ordinary terms of its contracts are "two to three years, which makes the [2019] information particularly valuable for targeting potential clients in 2021 and 2022." Id.

On October 10, 2019, Martin submitted his formal resignation to Dash, and later signed a Separation Agreement on October 24, 2019. Id. ¶ 15. Martin continued to work for Dash until December 31, 2019. Id. ¶ 16. As provided for by Martin's Employment Agreement, March 30, 2020 was the last day of his 90 day Restricted Period. Id. ¶ 18.

Before Martin's last day at Dash, Dash removed "all access" to its trade secrets on Martin's devices. Id. ¶ 19. However, because Martin had allegedly emailed trade secrets to himself, Dash alleges that it was "unaware" that Martin had done so and therefore "could not remove" access to those trade secrets that Martin had sent to himself. Id.

Dash alleges that Martin began working for Axiom "at least by March 2020." Dash alleges that it sent Martin a letter on March 13, 2020, "concerning his recent employment at Axiom and notifying [Martin] of his ongoing obligations to Dash." Id. ¶ 27. Martin responded to Dash's letter by email on May 4, 2020, stating that "I am aware of no confidential Dash information in my possession." Id.

5

On April 16, 2020, Dash mistakenly received an email "addressed to [Martin's] old Dash e-mail from a potential customer regarding a second meeting with Axiom." Id. ¶ 21. On that same day, another potential Dash client emailed Martin's old Dash email address in order to cancel a second meeting with Axiom. Id. ¶ 24. Dash alleges that this second email "was intended for receipt by [Martin] at Axiom" and allegedly shows that Martin "solicited a prospective Dash client away from Dash" by using Dash's trade secrets "to steal business from Dash." Id.

On May 1, 2020, an existing Dash client emailed Martin's old Dash email address with the subject line "Axiom meeting." Id. ¶ 25. On June 22, 2020, the same client emailed Martin's old email address again, attaching a License Services Agreement between that client and Axiom. Id. Dash alleges that the emails were intended to be received by Martin at Axiom, and that this client's contract information was "included in the list of Dash clients and contract information" that Martin had sent to his personal email account on January 3, 2019. Id.

On July 26, 2021, another existing Dash client emailed Martin's old Dash email address, noting that "there has been good progress made on Axiom," and attaching a Broker Dealer Pricing Proposal that Axiom had presented to that client. Id. ¶ 26. The Broker Dealer Pricing Proposal allegedly includes a

6

statement "that 10 or more previous Dash clients have begun working with Axiom in the past 18 months," which Dash alleges "is approximately how long Martin had been working at Axiom at the time [the Broker Dealer Pricing Proposal] was circulated." Id. The Broker Dealer Pricing Proposal also "contain[ed] details of SEC solution components to target the needs of this Dash client" and "advertises price details that are similar to but more favorable than Dash prices." Id. Dash alleges that the email was intended to be received by Martin at Axiom, and that the client "was listed on the spreadsheet[] which [Martin] emailed to himself on May 9, 2019." Id.

Dash alleges that it has "lost clients and revenue to Axiom" as a result of Axiom's alleged use of Dash's trade secrets. Id. ¶ 28. Specifically, Dash alleges that it "has lost at least two client contracts and expects to lose at least another four client contracts," resulting in millions of dollars in projected lost revenue. Id. Dash brings claims for misappropriation of trade secrets under the DTSA and New York state law.

## II.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.

7

2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, it need not accept as true legal conclusions contained in the complaint. Id.

III.

The DTSA provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). For information to constitute a trade secret, (A) the owner must have "taken reasonable measures to keep such information secret," and (B) the information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being

8

readily ascertainable through proper means by, another person
who can obtain economic value from the disclosure or use of the
information." Id. § 1839(3)(A)-(B). "Misappropriation" includes
"acquisition of a trade secret of another by a person who knows
or has reason to know that the trade secret was acquired by
improper means." Id. § 1839(5).

To state a claim for trade secret misappropriation under
the DTSA, a plaintiff must show that (1) it possessed a trade
secret, and (2) the defendant misappropriated that trade secret.
ExpertConnect, L.L.C. v. Fowler, No. 18-cv-4828, 2019 WL 3004161
at *3 (S.D.N.Y. July 10, 2019); see also N. Atl. Instruments,
Inc. v. Huber, 188 F.3d 38, 43-44 (2d Cir. 1999) (stating that
the same test governs a New York state law claim for
misappropriation of trade secrets). When evaluating claims under
the DTSA, courts in this district "often rely on cases
discussing misappropriation under New York law." ExpertConnect,
2019 WL 3004161, at *4 n.1. This is because "the requirements
for showing a misappropriation of a trade secret under the DTSA
are similar to those for misappropriation under New York law."
Id. Because federal and state law claims for misappropriation of
trade secrets are analyzed similarly, "[i]f a complaint
sufficiently alleges a claim under the DTSA, it also
sufficiently pleads misappropriation of trade secrets under New

York law." Kraus USA, Inc. v. Magarik, No. 17-cv-6541, 2020 WL
2415670, at *5 (S.D.N.Y. May 12, 2020).

First, Axiom argues that Dash has failed to allege, with
sufficient particularity, the trade secrets that were
misappropriated. "[D]istrict courts in this circuit routinely
require that plaintiffs plead their trade secrets with
sufficient specificity to inform the defendants of what they are
alleged to have misappropriated." Zabit v. Brandometry, LLC, 540
F. Supp. 3d 412, 422 (S.D.N.Y. 2021). However, Dash alleges
specifically that Martin emailed himself "a list of eleven Dash
customer contracts . . . includ[ing] revenue dollars by [the]
customer[s] and the percent increase from the prior year,"
"financial information regarding two executed contracts,
totaling $330,000, and information regarding a contract returned
with redlines for an amount of $75,000 with the potential of
growing to $180,000 by 2021," and "a screenshot of a spreadsheet
showing the status of 28 customer contracts and sensitive Dash
pricing information . . . includ[ing] client names, revenue, and
status[es] of the contract[s] identifying whether [they were]
cancelled, out for signature, due for follow-up, or an executed
contract." Compl. ¶ 14. These allegations are more than
sufficient to allege with particularity the trade secrets
allegedly misappropriated from Dash. See In re Dana Corp., 574
F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data

relating to pricing, costs, systems, and methods are protected by trade secret law.").

Axiom relies on a line of cases to argue that Dash has not pleaded its trade secrets with requisite specificity, but those cases are easily distinguishable. Dash does not allege trade secrets which are "vague and indefinite piece[s] of information," Broker Genius, Inc. v. Zalta, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017), because it has specified exactly which contracts, customer pricing information, and client preferences Martin is alleged to have sent to himself. For the same reason, Dash has also not "[a]lleg[ed] the existence of general categories of confidential information, without providing any details to generally define the trade secrets at issue," because Dash has specified which trade secrets Axiom allegedly misappropriated. Cf. Elsevier Inc. v. Doctor Evidence, LLC, No. 17-cv-5540, 2018 WL 447906, at *6 (S.D.N.Y. Jan. 23, 2018) (finding that alleged trade secrets of "clinical methods," "processes" and "interpretation of data" were not pleaded with sufficient particularity); Sapir v. Rosen, No. 20-cv-6191, 2021 WL 4482277, at *7 (S.D.N.Y. Sept. 30, 2021) (finding that trade secrets were insufficiently particular where the descriptors were too general). As pleaded, Dash has more than sufficiently identified "the general contours of [its] alleged trade

11

secrets." <u>Dardashtian v. Gitman</u>, No. 17-cv-4327, 2017 WL6398718,
at *5 (S.D.N.Y. Nov. 28, 2017).

Dash has also pleaded sufficiently that Axiom was in
possession of, and misappropriated, Dash's trade secrets. Dash
alleges that it mistakenly received three emails intended for
Martin, while Martin was working at Axiom, from existing Dash
clients who were now engaged in business with Axiom and which
emails contained elements of Dash's trade secret information
that Martin had sent to his personal email address upon his
departure from Dash. <u>See</u> Compl. ¶¶ 21-26. One of those emails,
sent by an existing Dash client, also included a statement "that
10 or more previous Dash clients ha[d] begun working with Axiom
in the past 18 months," a time period which allegedly coincided
with "how long Martin had been working at Axiom" at the time
that email was sent. <u>Id.</u> ¶ 26. These alleged facts permit the
reasonable inference that Axiom, through its employee Martin,
misappropriated Dash's trade secrets in an effort to poach
Dash's existing customers. <u>See</u> <u>Riviello v. Waldron</u>, 391 N.E.2d
1278, 1281 (N.Y. 1979) (an employee's tortious acts are
imputable to the employer if "the act was done while the servant
was doing his master's work, no matter how irregularly, or with
what disregard of instructions"). The Broker Dealer Pricing
Proposal that Axiom used to solicit an existing Dash client was
tailored to Dash's own specific understanding of that client's

particular needs, which would not have been possible unless
Axiom knew of Dash's trade secret information for that client.
See ExpertConnect, 2019 WL 3004161, at *6 ("The Complaint also
plausibly pleads misappropriation based on the theory that [the]
[d]efendants disclosed and used [the plaintiff's] trade secrets
to solicit [the plaintiff's] clients without [the plaintiff's]
consent."); Am. Bldg. Maint. Co. of N.Y. v. Acme Prop. Servs.,
Inc., 515 F. Supp. 2d 298, 308-09 (N.D.N.Y. 2007) ("[W]here . .
. it would be difficult to duplicate a customer list because it
reflected individual customer preferences, trade secret
protection should apply.").

Finally, Axiom argues that, in any event, Dash is not
entitled to injunctive relief for its trade secrets claim.
However, the DTSA explicitly provides that an injunction may be
appropriate relief for actions brought under the statute. See 18
U.S.C. § 1836(b)(3)(A). If Dash is successful in this
litigation, injunctive relief may be an appropriate remedy. See
Five Star Dev. Resort Communities, LLC v. iStar RC Paradise
Valley LLC, No. 09-cv-2085, 2010 WL 2697137, at *4 (S.D.N.Y.
July 6, 2010) (allowing claims for injunctive relief to proceed
where the plaintiff's "factual allegations related to its
entitlement to these remedies . . . are enough to raise a right
to relief above the speculative level"). Thus, at this point, it

13

would be premature to dismiss Dash's claim for injunctive
relief.

Accordingly, Axiom's motion to dismiss Dash's claims for
misappropriation of trade secrets is **denied.**

### IV.

Axiom also moves to dismiss the complaint pursuant to
Federal Rule of Civil Procedure 12(b)(7) on the basis that Dash
has not joined Martin as a defendant in this case, arguing that
Martin is a necessary party to this litigation under Federal
Rule of Civil Procedure 19. "Rule 19 sets[] forth a two prong
test to determine whether an action must be dismissed pursuant
to a Rule 12(b)(7) motion." Fanbrella, Inc. v. EDT Prods., Inc.,
185 F.R.D. 144, 147 (E.D.N.Y. 1999). First, it must be
determined whether the third party is "necessary" to the action
by asking: (1) whether complete relief can be granted to the
present parties; or (2) whether a third party claims an interest
in the disposition of the current proceedings, and whose
interest would be impaired if that third party were not joined
in the action. Id. at 147-48. In this case, complete relief can
be granted among the present parties. Dash has sued only Axiom,
and relief can be obtained against Axiom without interfering
with Martin's rights because any claims that Dash may have
against Martin are currently being arbitrated pursuant to a
mandatory arbitration clause provided in Martin's employment

agreement with Dash and, in this case, Dash is not seeking any
relief pursuant to the terms of that employment agreement. See
Def.'s Memo., ECF No. 29, at 3; Pl.'s Opp., ECF No. 30, at 17.
Any potential interest that Martin may have in this litigation
is adequately protected by his ability to represent those
interests in arbitration. See MasterCard Int'l, Inc. v. Visa
Int'l Serv. Ass'n, Inc., 471 F.3d 377, 387 (2d Cir. 2006)
("Necessary parties under Rule 19(a)(2)(i) are only those
parties whose ability to protect their interests would be
impaired because of that party's absence from the litigation.").
Moreover, Martin, as the third party, has not claimed an
interest in the litigation. See Peregrine Myanmar Ltd. v. Segal,
89 F.3d 41, 49 (2d Cir. 1996) ("It is the absent party that must
claim an interest."). Although Martin's actions are important to
the facts of this case, this does not make him a necessary party
within the meaning of Rule 19, and the fact that Axiom may be
enjoined does not parties other than Axiom necessary to this
litigation. See Edward B. Beharry & Co., Ltd. v. Bedessee
Imports Inc., No. 09-cv-77, 2013 WL 12363612, at *4 (E.D.N.Y.
June 24, 2013) (finding that a third party was not a necessary
party despite the plaintiff's seeking injunctive relief where
the injunctive relief sought "would not require imposing any
affirmative obligation" on that third party); see also Peregrine
Myanmar, 89 F.3d at 48 ("Complete relief can be accorded even

without the [third party], because nothing . . . requires the [third party] to do anything or change any of its positions."). Accordingly, Martin is not a necessary party to this litigation, and Axiom's motion to dismiss pursuant to Rule 12(b)(7) is **denied**.

V.

The Court has considered all the arguments of the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. Axiom's motions to dismiss the plaintiff's claims for misappropriation of trade secrets pursuant to Rules 12(b)(6) and 12(b)(7) are **denied**. The Clerk is directed to close all pending motions.

**SO ORDERED.**

**Dated:**   **New York, New York**
        **March 21, 2023**

                          John G. Koeltl
                          United States District Judge